# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                    Case No. 06-Cr-224

WILLIAM A. DOYLE
 a/k/a BILL DAVIDISON,

    Defendant.

## MAGISTRATE JUDGE'S RECOMMENDATION TO THE HONORABLE LYNN ADELMAN

## NATURE OF CASE

Defendant William A. Doyle, a/k/a Bill Davidison was charged in a five count indictment returned on September 19, 2006, by a federal grand jury sitting in this district. In Count One, the defendant is charged with traveling in interstate commerce for the purpose of engaging in illicit sexual conduct with a person under 18 years of age, in violation of 18 U.S.C. § 2423(b). Count Two charges the defendant with using a computer connected to the internet to attempt to knowingly persuade, induce, entice and coerce a person under 18 years of age to engage in sexual activity in violation of 18 U.S.C. § 2422(b). Counts Three and Four charge the defendant with distributing child pornography that had been mailed, shipped and transported in interstate or foreign commerce by computer, in violation of 18 U.S.C. § 2252(a)(2). In Count Five, the defendant is charged with violating 18 U.S.C. § 2252(a)(4)(B). The defendant entered a plea of not guilty to the charges on September 27, 2006.

The defendant filed several motions all of which have been addressed by the court with the exception of the following two motions: 1) motion to suppress statements (Docket #22) and 2) motion to suppress: unlawful stop and arrest (Docket #23). The defendant requested an evidentiary hearing on both motions. The court denied his request with respect to his motion to suppress statements because the issue raised was a question of law. An evidentiary hearing was held on the defendant's motion to suppress the allegedly unlawful stop and arrest. This motion to suppress the allegedly unlawful stop and arrest will be addressed herein. The remaining motion will be addressed in a separate decision.

## **MOTION TO SUPPRESS UNLAWFUL STOP AND ARREST**

On November 2, 2006, the court conducted an evidentiary hearing. At the hearing, the following individuals testified on behalf of the government: Milwaukee Police Department (MPD) Detectives Sean Lips and Richard McKee and Daniel Ruzinski, MPD Lieutenant of Detectives. MPD Officer Staci Steen was called as a witness by the defendant. Based on the evidence presented at the hearing, the court makes the following findings of fact.

### **Findings of Fact**

Prior to August 23, 2006, MPD Detective Sean Lips had been working in an undercover capacity, acting as a 15-year-old boy named "Nick." He had conversations on the internet with an individual using the name "Bill Davidson" at an internet address, xstarmcx@yahoo messenger. Subsequently Bill Davidson was identified as the defendant, William A. Doyle. During these conversations, the defendant told "Nick" that he was 29 and that he had work in the Milwaukee area which was why he was coming to the city. The defendant provided Nick with photographs, none of which showed the defendant's face. One photo was of a hand

holding a penis. Detective Lips knew from his experience that individuals do not always provide accurate information when communicating via the internet.

Also prior to August 23, 2006, Detective Lips had telephone conversations with the defendant and one of those conversations was recorded. During the very graphic conversation, the defendant asked "Nick" numerous personal questions, including questions about his sexual activities. The defendant also told "Nick" that he was 6 feet, 1 inch tall and weighed 185 pounds. Based on these prior contacts with the defendant, Detective Lips was aware that the defendant was flying into Milwaukee and would be arriving from Texas at approximately 11:00 a.m. on August 23, 2006. It was Detective Lips' understanding that he would be meeting the defendant on August 23, 2006, or on the following day. Lieutenant Ruzinski and Detective McKee knew that "Bill" Davidson would be flying into Milwaukee at about 11:00 a.m.

On Wednesday, August 23, 2006, the defendant text messaged "Nick" on the internet and had asked "Nick" to come online at noon. Prior to noon, Detective Lips listened to the previously recorded conversation with the defendant. Detective Lips was preparing a sheet of all the information he had about the defendant when the defendant called him on August 23, 2006. He shared the information about the defendant and the CD with the recorded conversation with Lieutenant Daniel Ruzinski, his supervisor, and Detective Richard McKee.

At approximately 12:09 p.m., Detective Lips was on the internet when the defendant came online and advised him that he was in Milwaukee. The defendant asked Detective Lips, posing as "Nick," if he wanted to meet him at the prearranged meeting spot. "Nick" and the defendant previously had discussed a place to meet. The decision was made to meet at the

- 3 -

Citgo gas station located at 82nd Street and Capitol Drive in Milwaukee, Wisconsin. The defendant said he was already at the meeting location which surprised Detective Lips.

Detective Lips notified his supervisor and Detective McKee that the defendant was already at the meeting location. Detective Lips knew he was at the gas station on August 23, 2006, because the defendant described it as a "small" gas station. The two law enforcement officers left the Milwaukee Police Administration Building in separate vehicles to set up surveillance at the meeting site. Detective McKee was in an undercover vehicle, a Lincoln Navigator, which had no visible light bars. Detective Lips tried to keep the defendant online so that the other officers would have time to set up surveillance. It took the officers approximately 15-20 minutes to get to the target location.

During this conversation, in an attempt to determine where "Nick" lived, the defendant asked "Nick" if he would pass a church or a school on his way to the site of their meeting. He also asked if "Nick" lived on the north or south side of Capitol Drive. The defendant was led to believe that "Nick" lived on 82nd Street. The defendant described the gas station on 82nd Street and Capitol Drive as a small Citgo gas station. The conversation ended at 12:20 p.m. and the defendant said he would be offline for about 20 minutes. Detective Lips relayed this information to his lieutenant and Detective McKee who were en route to the area.

At approximately 12:48 p.m., the defendant came back online and had a conversation with "Nick." The defendant asked "Nick" if his mom was home yet and "Nick" responded that she was not. "Nick" told the defendant that he did not have to cross Capitol Drive to reach the Citgo station, in other words indicating that he lived on the north side of Capitol Drive. He asked the defendant how he would know it was him and the defendant told him to stay near the pay phone at the Citgo station.

During the second online chat, "Nick" understood that he would be meeting the defendant. The defendant asked him whether he would be walking or riding his skate board. This conversation ended at approximately 12:53 p.m. A that time, Detective Lips advised the surveillance units that the defendant had logged off the computer. In his 29-page report about his communications with the defendant and the events of August 23, 2006, Detective Lips' record of times of the computer communications is based on the time reported on his computer.

Based on Detective Lips' experience, a person can communicate on Yahoo with Yahoo Messenger either via computer or cell phone. If a person is using a cell phone to instant message, a small icon appears on the receiving computer screen. In his communication with the defendant, no icon showed up on Detective Lips' computer screen so he knew that the defendant was communicating via computer and not by means of a cell phone.

After they left to set up surveillance, Detective Lips communicated with Lieutenant Ruzinski and Detective McKee via two-way radio on Channel 14 and also by phone. Detective McKee and Lieutenant Ruzinski were in communication with each other by radio and phone. MPD Officer Staci Steen, a uniformed officer, was also in communication with Detective Lips.

Lieutenant Daniel Ruzinski supervises the MPD High Tech Unit and is the part of the Child Pornography Task Force. Detective McKee is assigned to in the High Tech Unit. Both Lieutenant Ruzinski and Detective McKee were aware of Detective Lips' undercover operation with an individual named "Bill Davidson." Lieutenant Ruzinski had listened to the recording of a telephone conversation with "Mr. Davidson" on about August 20, 2006. He listened to about 30 seconds of the conversation, not the entire conversation. On August 23, 2006, Detective McKee listened to this recorded conversation with the defendant several times.

- 5 -

At approximately 12:09 p.m. on August 23, 2006, Detective Lips advised Lieutenant Ruzinski that the subject of the investigation was in the target area at 82nd and Capitol Drive. Lieutenant Ruzinski told Detective Lips to attempt to drag out the conversation with the defendant so that officers could set up surveillance at the meeting location. Based upon information the defendant provided to Detective Lips, Lieutenant Ruzinski believed that the suspect involved was a white male in his 30s.

Lieutenant Ruzinski drove alone to the area of 82nd Street and Capitol Drive in an unmarked Ford Explorer vehicle. He was not in uniform. He set up surveillance in the 3800 block of 82nd Street and was then advised by Detective Lips that the defendant was back online.

Lieutenant Ruzinski initially had parked his Ford Explorer, but he then began to drive north on 82nd Street. He observed a person typing on a laptop in a dark grey four-door full-size Kia automobile which was parked on 82nd Street facing south. As Lieutenant Ruzinski drove past the vehicle, he could see the person's hands moving up and down on a keyboard. The computer was on the passenger seat of the vehicle. He observed the individual, later identified as the defendant, for about 15 seconds. He saw the defendant's face, but not his body. Lieutenant Ruzinski shared this information with the other officers. Lieutenant Ruzinski did not recall being told the weight of the defendant. At this time, Detective McKee had set up surveillance and was parked on North 82nd Street, just north of the Citgo station.

Lieutenant Ruzinski informed Detective McKee that he observed a person in the 3800 block of 82nd Street using a laptop computer in his vehicle, but that he was unable to get the license plate number. He asked Detective McKee to drive past the vehicle and get the plate number. Detective McKee drove south on 82nd Street and saw an individual outside the

identified vehicle. He obtained the plate number of the car. He also observed the individual outside the vehicle putting a laptop on the backseat. He could observe the laptop because the person was not completely blocking the car door. At that time, the two doors on the driver's side were open. Detective McKee was aware that the individual communicating with Detective Lips had said he was six feet tall, weighed 185 pounds and was 29 years old. Detective McKee had no photographs of the person or a description of the car.

Detective McKee also was aware that the online chat between Detective Lips and "Bill Davidson" had ended prior to his driving past the vehicle on 82nd Street. After he obtained the license plate number and broadcast it on Channel 14, Detective McKee went back to his previous location and set up surveillance.

Officer Steen ran the license plate check.[1] The officers were advised that the license plate was registered to a Buick automobile from a rental car agency holding company at O'Hare International Airport in Chicago, Illinois. The car the defendant was driving was a Kia. Based on his prior experiences with traffic stops, Lieutenant Ruzinski is aware that cars with Illinois license plates are rented in Wisconsin. Detective McKee is aware that rental car companies often have vehicles registered in other states.

Meanwhile, Lieutenant Ruzinski continued driving north on 82nd Street, turned right onto Capitol Drive and right again on 81st Street and then right on Vienna Street, where he parked his vehicle in the 3700 block of Vienna. Detective Lips radioed Lieutenant Ruzinski and told him that the defendant was offline. Detective Lips also said that the defendant was aware that "Nick" lived north of Capitol Drive. Lieutenant Ruzinski then observed the defendant exit the

---

[1] Detective Lips also ran the license plate, but initially he entered wrong information so Officer Steen obtained the plat information first.

- 7 -

vehicle, open the rear door and place something inside the car. The defendant was wearing a baseball cap. Lieutenant Ruzinski then saw the defendant's vehicle, which had been facing south on 82nd Street, make a U-turn at the intersection and then proceed north on 82nd Street.

Lieutenant Ruzinski began to follow the defendant's vehicle. The defendant stopped at a stop sign and proceeded north on 82nd Street. The defendant was traveling northbound very slowly on 82nd Street, going about ten miles per hour in the 25 miles per hour zone. Lieutenant Ruzinski then turned right on Capitol Drive and north on 81st Street. Detective McKee, who was also on surveillance, reported that the defendant's vehicle had just passed him. At that time, Detective McKee had set up surveillance north of Capitol Drive on 82nd Street.

Detective McKee observed the Kia traveling northbound on 82nd Street. Detective McKee was aware that Detective Lips had told the defendant that he would be coming from north of Capitol Drive on 82nd Street. The defendant drove very slowly and looked into the Citgo gas station lot. He drove past Detective McKee and, a short time later, he came down 82nd Street southbound and passed Detective McKee again. At that time, the defendant was driving less than ten miles per hour. The defendant drove past the Citgo station twice. There was a stop sign at the corner of 82nd Street and Capitol Drive. The speed limit on 82nd Street is 25 miles per hour and there was very little traffic on that street at the time. The defendant turned right onto Capitol Drive and slowly drove in the parking lane, scanning the gas station lot. The defendant did not stop at the gas station, although he slowly drove by it. No cars were in the parking lane at that time. The speed limit in this area of Capitol Drive is 35 miles per hour.

Lieutenant Ruzinski also saw the defendant looking at the gas station as he drove slowly onto Capitol Drive. A pay phone is located on the west of the gas station. The defendant did not stop at the gas station, although he drove very slowly around it. He turned into the parking lane as he turned onto Capitol Drive. No cars were in the parking lane at that time.

The defendant then turned onto 83rd Street at which time Lieutenant Ruzinski called Officer Steen to do a traffic stop on the defendant's vehicle. Officer Steen, who was in uniform in an unmarked squad car with emergency lights and a siren, had been directed to the area of 80th Street and Capitol Drive in the early afternoon of August 23, 2006. Detective Lips had asked for assistance on a "take down" on a traffic stop. Lieutenant Ruzinski had told Office Steen where the defendant's vehicle was located so she went to that area.

Lieutenant Ruzinski decided to stop the defendant's vehicle because the person in the Kia was online on his laptop in the meet area at the same time that Detective Lips was conversing with the target. The individual who was on the computer also logged off the computer at the same time as the suspect conversing with Detective Lips. In addition, the license plate of the vehicle listed to a Buick, not a Kia. Although the vehicle listed to a rental agency in Chicago, Lieutenant Ruzinski was aware that the vehicle could have been moved from O'Hare Airport to Milwaukee or the defendant could have flown to O'Hare and driven to Milwaukee. He was also concerned because the defendant was driving around the meet area very slowly and exhibited suspicious conduct. In particular, the defendant was scanning the meeting area at the Citgo gas station.

Officer Steen observed the defendant traveling north on 83rd Street in front of Lieutenant Ruzinski's vehicle shortly before the stop. She was behind Lieutenant Ruzinski's vehicle. Officer Steen passed Lieutenant Ruzinski's vehicle and activated the lights on her

- 9 -

vehicle to effectuate the traffic stop. Officer Steen pulled up behind the Kia and the defendant pulled the vehicle over to the side of the road. She and one of the other officers approached the vehicle. The defendant's window was open and Officer Steen said to him, "Let me see your hands." She also told him to step out of the vehicle and turn around. Lieutenant Ruzinski and Detective McKee heard Officer Steen ask the defendant to get out of the vehicle. At that point, Detective McKee was in front of the defendant's vehicle and Lieutenant Ruzinksi was in the back. The defendant was very compliant and asked, "What's going on?" Detective McKee recognized the defendant's voice as the voice on the CD which he had listened to several times.

    Detective McKee had no doubt that the individual in the vehicle was the same person who had been speaking to Detective Lips via the internet and the same person he had heard on the CD. Detective McKee based this conclusion on the fact that the defendant had flown in from out-of-state and was in a rental vehicle in the immediate area of the meeting place which had been arranged with "Nick." The defendant was typing on a laptop computer at exactly the same time as the conversations took place with Detective Lips and the conversation terminated at exactly the same time as the conversation that Detective Lips had with "Bill Davidson." The defendant was observed circling around the meeting location, the Citgo gas station, at a low rate of speed as he scanned the gas station area. Detective McKee's conclusion was confirmed when he heard the defendant's voice at the traffic stop. Detective McKee described the voice on the phone call which was recorded on the CD as a male voice with a southern accent.

    Detective McKee told the defendant to put his hands behind his back. Officer Steen handcuffed the defendant using sets of two handcuffs. The defendant was then patted down

and told that he was under arrest. The defendant was cooperative and did not protest. He was placed in Detective McKee's car. The defendant stated that he wanted to talk to the detective in charge. No guns were drawn during the takedown of the defendant's vehicle.

## **Analysis**

In seeking suppression of the evidence, the defendant asserts that the warrantless stop of his vehicle, his arrest and the subsequent searches of his person and his vehicle were unreasonable, unsupported by probable cause and not justified by any exception to the warrant requirement of the Fourth Amendment to the United States Constitution. Specifically, the defendant maintains that at the time of the stop, the officers had no description of the suspect or his vehicle. They only knew that "Bill Davidson" had told "Nick" that he was 29 years old. The defendant, who is in 50s, also points out that the suspect had stated that he was flying into Milwaukee, but the license plates on the defendant's vehicle registered to a rental car agency in Chicago. In addition, the defendant never stopped his vehicle at the meeting spot, the Citgo gas station.

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. Const. amend. IV. A law enforcement officer may legally arrest a suspect without a warrant only if the officer has probable cause to believe the suspect has committed a crime and the suspect is not inside his home. Payton v. New York, 445 U.S. 573, 576 (1980); United States v. Watson, 423 U.S. 411, 423-24 (1976); United States v. Sawyer, 224 F.3d 675, 678 (7th Cir. 2000). The police have probable cause to arrest an individual where "the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 90 (1964); Sawyer, 224

- 11 -

F.3d at 678; United States v. Gilbert, 45 F.3d 1163, 1166 (7th Cir. 1995). "In dealing with probable cause . . . as the very name implies, we deal with probabilities." Brinegar v. United States, 338 U.S. 160, 175 (1949). "Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." Beck, 379 U.S. at 89.

A law enforcement officer has probable cause to make an arrest "when the facts within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense." United States v. Schaafsma, 318 F.3d 718, 722 (7th Cir. 2003) (quoting United States v. Sawyer, 224 F.3d 675, 678-79 [7th Cir. 2000]); see Watson, 423 U.S. at 418. Probable cause requires only a substantial chance of criminal activity, not an actual showing of such activity. See Illinois v. Gates, 462 U.S. 213, 244 n.13 (1983). Mere suspicion is not enough. In Schaafsma, the court explained that while mere suspicion is not enough, probable cause "need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." Schaafsma, 318 F.3d at 722 (quoting United States v. Burrell, 963 F.2d 976, 986 [7th Cir. 1992]). "So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists." Sawyer, 224 F.3d at 679.

After law enforcement officers make a lawful arrest, they may search the person of the arrestee and any area in his immediate control without a search warrant in order to protect them from danger and prevent the destruction of evidence. Chimel v. California, 395 U.S. 752, 768 (1969). The search must be contemporaneous with the arrest, conducted to prevent the use of a weapon or the destruction of evidence and limited to the area within the arrestees' immediate control. United States v. Bennett, 908 F.2d 189, 193 (7th Cir.1990).

- 12 -

Moreover, when officers make a valid arrest of the occupant of a vehicle, they may search the passenger compartment of the vehicle and any containers within the passenger compartment, including "closed or open glove compartments, consoles, or receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing, and the like." New York v. Belton, 453 U.S. 454, 460 & n.4 (1981). The authority to make a search incident to arrest derives from a police officer's general need to disarm suspects and preserve evidence, but its legality does not depend on the likelihood that a particular suspect is armed or concealing evidence. United States v. Robinson, 414 U.S. 218, 234-35 (1973).

In this case, the law enforcement officers had probable cause to stop the defendant's vehicle. Detective Lips, operating in an undercover capacity as a 15 year old named "Nick," had numerous internet and telephone conversations of a sexual nature with an individual who identified himself as "Bill Davidson," a 29 year old male from Texas. Arrangements had been made for the defendant to meet "Nick" for a sexual encounter in Milwaukee in August 2006.

On August 23, 2006, the defendant text messaged "Nick" and told him to come online at noon. At approximately 12:09 p.m., Detective Lips was on the internet when the defendant came online and said that he was in Milwaukee and already at the meeting location, a Citgo gas station on North 82nd Street and Capitol Drive. Detective Lips notified his supervisor and Detective McKee who immediately left the police administration building to set up surveillance at the gas station. This conversation with the defendant ended at 12:20 p.m. and the defendant said he would be offline for about 20 minutes.

At about 12:49 p.m., the defendant came back online and he and Detective Lip discussed their meeting that day. When Detective Lips asked how he would recognize the defendant, the defendant told him to stay near the pay phone at the Citgo station. This

- 13 -

conversation ended at approximately 12:53 p.m. Detective Lips advised the surveillance officers that the defendant had logged off the computer. The evidence establishes that the defendant was communicating with Detective Lips by means of his computer, not a cell phone. If a person is using a cell phone to instant message, a small icon appears on the screen of the receiving computer. No icon appeared on Detective Lips' computer screen.

The evidence also shows that at the time Detective Lips was in communication with the defendant, Lieutenant Ruzinski was in the meeting area and observed a man typing on a laptop in his car, a dark grey, four-door Kia, which was parked on North 82nd Street just south of Capitol Drive. He could see the man's hands moving up and down on a keyboard. Lieutenant Ruzinski conveyed this information to the other officers, including Detective McKee who was parked on North 82nd Street, just north of the Citgo gas station. Lieutenant Ruzinski asked Detective McKee to drive past the Kia and get the license plate number.

Detective McKee drove south on 82nd Street and saw a man, who was standing outside the Kia, placing a laptop computer on the backseat. By this time, Detective McKee had been advised that the person communicating with Detective Lips had logged off his computer. Detective McKee radioed in the license plate number. The license plate check revealed that the plate was registered to a Buick automobile from a rental car agency holding company at O'Hare International Airport, not a Kia. Lieutenant Ruzinski knew that cars with Illinois license plates are rented in Wisconsin. Detective McKee is aware that rental car companies often have vehicles registered in different states.

After the license plate was identified, the officers conducted surveillance on the defendant's vehicle. Lieutenant Ruzinski followed the defendant's car and observed him travel

- 14 -

very slowly northbound on 82nd Street. The defendant was driving about ten miles per hour in a 25 mile per hour zone.

Detective McKee also observed the defendant traveling northbound on 82nd Street, north of Capitol Drive. "Nick" had told the defendant that he lived on 82nd Street, north of Capitol Drive. A short time later, the defendant passed Detective McKee, this time traveling southbound on 82nd Street. He was traveling less than ten miles per hour. The defendant slowly drove past the Citgo station twice and was looking into the station. At the stop sign on the corner of Capitol Drive and 82nd Street where the gas station is located, both officers observed the defendant turn right on Capitol Drive and drive in the parking lane. The defendant continued to scan the gas station area as he slowly drove by the station. The pay phone is located on the west side of the gas station. The speed limit on Capitol Drive is 35 miles per hour. The defendant then turned north on 83rd Street where he eventually was stopped by Officer Steen.

Based on the information from Detective Lips, the defendant's presence in the meeting location, his suspicious conduct and driving, and the fact that he was on his computer in his car at exactly the same time and logged off the computer at exactly the same time as the person conversing with Detective Lips, the officers clearly had probable cause to believe that the defendant was the person attempting to meet a 15-year-old boy for the purpose of an illegal sexual encounter. In addition, the officers also had probable cause for the stop because the license plates on the Kia did not match the registration for the plates. The Illinois license plates registered to a Buick, not a Kia. Probable cause requires only a substantial chance of criminal activity on the suspect's part, not evidence sufficient to support a conviction. See Illinois v. Gates, 462 U.S. at 244 n.13; Schaafsma, 318 F.3d at 722. Here,

the officers had sufficient information to establish probable cause for the stop of the defendant's car.

The officers also had probable cause to arrest the defendant. In addition to the information providing the basis for the probable cause stop of the vehicle, Detective Mckee, who had listened to the recorded conversation between Detective Lips and the defendant, heard the defendant ask what was going on as he was asked to step outside his car following the stop. Detective McKee recognized the defendant's voice and positively identified that voice as the voice on the recorded conversation with Detective Lips. Since the defendant was validly arrested, the officers could search his vehicle. See Belton, 453 U.S. at 460 & n.4.

Accordingly, the court concludes that the law enforcement officers had ample probable cause to stop the defendant's vehicle and arrest the defendant. The officers properly could search of the defendant and his vehicle incident to his lawful arrest. Therefore, the court will recommend that the defendant's motion to suppress unlawful stop and arrest be denied.

## CONCLUSION

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that the United States district judge enter an order **denying** defendant William Doyle's motion to suppress unlawful stop and arrest. (Docket #23).

Your attention is directed to 28 U.S.C. § 636(b)(1)(A) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case.

Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 18th day of December, 2006.

BY THE COURT:

s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge