# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA
        Plaintiff,

v.                                                           Case No. 06-CR-224

WILLIAM DOYLE
        Defendant.

## DECISION AND ORDER

City of Milwaukee Police Department Detective Sean Lips, posing as a fifteen year old boy named "Nick," arranged via the internet to meet a man named "Bill Davidison" for a sexual encounter. Officers arrested "Davidison," later identified as William Doyle (hereafter "defendant"), at the rendezvous site, and the government indicted defendant on charges of traveling in interstate commerce for the purpose of engaging in illicit sexual conduct, use of a computer to attempt to persuade a minor to engage in sexual activity, and distribution and possession of child pornography.

Defendant moved to suppress evidence, arguing that the officers unlawfully stopped and arrested him. The motion was referred to a magistrate judge, who held a hearing then recommended that the motion be denied. Defendant objects and asks me to hold a de novo evidentiary hearing. See Fed. R. Crim. P. 59(b). For the reasons that follow, I decline to hold a de novo hearing and instead adopt the recommendation and deny the motion.

## I. FACTS

### A. Detective Lips

Detective Lips testified that he was assigned to the Criminal Investigation Bureau, High

Technology Unit, which performed on-line investigations of child exploitation. (Nov. 2, 2006 Hr'g Tr. at 6-7.) Lips testified that on August 16, 2006 he began communicating, initially over the internet and later by phone, with an individual who identified himself as Bill Davidson. Bill indicated that he was from Texas, 6'1" tall, 185 pounds, with green eyes and brown hair. (Id. at 23.) Bill later transmitted a photo revealing that he was a white male, but the picture did not show his face. (Id. at 24.) Bill indicated that he would be traveling into Milwaukee at about 11:00 a.m. on August 23, and the two discussed meeting at a Citgo gas station near "Nick's" house. Bill told "Nick" to be on-line at about noon on that day. (Id. at 25-26, 29, 30.)

Lips testified that on August 23 at about noon he went on-line, and Bill contacted him at 12:09 p.m., indicating that he was in Milwaukee and wanted to meet. (Id. at 9.) Lips testified that he could tell that defendant was communicating via computer rather than a cell phone based on the absence of an icon that appears when the latter device is used for messaging. (Id. at 17.) Bill stated that he was at the meeting location they had previously discussed, the Citgo gas station at 82nd and Capitol Streets. Lips testified that he was surprised to learn that Bill was already at the meet site because he expected that, upon Bill's arrival in Milwaukee, they would have further discussions as to whether they would meet later that day or the next day. (Id. at 11.) Lips immediately notified his supervisor, Lt. Dan Ruzinski and one of his colleagues, Det. Richard McKee, both of whom were aware of Lips's previous interactions with Bill. (Id. at 12.) Lips had advised Ruzinski and McKee that Bill was from Texas, had an accent and was flying into Milwaukee at 11:00 that day. (Id. at 18-19.) He had also played for Ruzinski a recording of a telephone conversation he had with Bill on August 19. (Id. at 19.)

McKee and Ruzinski responded to the meet site, while Lips attempted to delay Bill until surveillance units could reach the seen. (Id. at 12.) Bill and Lips conversed about where "Nick"

2

lived, and Lips was able to confirm that Bill was in the right place based on his description of the gas station. (Id. at 13.) Bill logged off at about 12:28, stating that he would be back in twenty minutes, then returned on-line at 12:48 p.m. (Id. at 15.) Bill asked whether "Nick" lived on the north or south side of Capitol on 82nd Street, and Lips stated that he did not have to cross Capitol to get to the Citgo station, which meant he lived on the north side. (Id. at 15-16.) Lips asked Bill how he would know him, and Bill stated that "Nick" should stay by the pay phone at the Citgo and he would call out his name. (Id. at 16.) The chat ended at 12:53 p.m., with the understanding that "Nick" would be proceeding from his house on 82nd Street to meet Bill. (Id. at 16.) Lips advised the surveillance units that Bill was logging off. (Id. at 17.)

**B.    Lt. Ruzinski**

Lt. Ruzinski testified that he has been in law enforcement for twenty-nine years, a lieutenant of detectives for eleven years, and in charge of the High Technology Unit, which he created, since August 2004. (Id. at 48.) He testified that at about 12:09 p.m. on August 23, 2006, Detective Lips advised him that a target he had been working on was in the Milwaukee area. (Id. at 49.) Ruzinksi stated that he was surprised because he expected the target to arrive and schedule a meeting for later. Lips stated that the suspect was in the target area, at 82nd and Capitol. (Id. at 50.) Ruzinski told Lips to stall the subject so that he and other officers could travel to the location to set up surveillance. Ruzinski understood that the subject was a white male in his 30s. (Id. at 51.)

Ruzinski traveled to the scene, which took about fifteen to twenty minutes, in an unmarked Ford Explorer. Upon his arrival, Lips advised Ruzinski that the subject was back on-line. (Id. at 52.) Ruzinski set up in the 3800 block of 82nd Street, then informed Detective McKee, who had set up just north of 82nd and Capitol, that the subject was on-line and that

3

he (Ruzinski) was going mobile to try to find the subject. (Id. at 52-53.) Ruzinski testified that he drove northbound on 82nd Street at about 15-20 mph and observed an individual in a parked car facing southbound. As he drove by, Ruzinski looked through the windshield and saw an individual typing on a laptop computer on the passenger seat. Ruzinski testified that he had a good vantage point because his Explorer was higher than the other car, a four-door Kia sedan. (Id. at 54, 76.) Ruzinski notified the other officers on surveillance that he believed he may have found the target. His belief was based Lips's advisement that he was on-line with the subject, who was using a computer rather than a cell phone, and the fact that the person in the Kia was using a laptop computer. Ruzinski observed that the suspect was a white male wearing a baseball cap. (Id. at 55.)

Ruzinski asked McKee to leave his location to get the Kia's license plate number, while he turned around and took up a vantage point south of 82nd and Vienna where he could still see the target vehicle. (Id. at 55-56.) Lips advised Ruzinski that the subject was now off-line, and Ruzinski then saw the occupant of the Kia exit and place something in the back seat of the vehicle. Lips further advised Ruzinski that he had told the subject that "Nick" lived north of Capitol on 82nd Street, information he had not previously shared. Shortly thereafter, the Kia made a u-turn and proceeded north on 82nd Street. (Id. at 57.) Ruzinski then learned from other officers that the license plate on the Kia listed to a Buick at O'Hare International Airport. Ruzinski took that to mean the car belonged to a rental agency at O'Hare. (Id. at 58.)

Ruzinski testified that he followed the Kia north on 82nd Street to Capitol, where the Kia stopped at a stop sign, then continued north on 82nd across Capitol. (Id. at 59.) Ruzinski testified that the Kia proceeded very slowly on 82nd Street, going maybe 10 mph in a 25 mph zone. (Id. at 60.) Ruzinski turned right on Capitol, then proceeded north in 81st Street. He

4

stated that he believed that the target was at that point looking for "Nick," whom he was told lived north of Capitol. McKee radioed Ruzinski and stated that the target was driving very slowly northbound on 82nd Street. Ruzinski took up a position on 81st and Hope, and shortly thereafter observed the suspect driving westbound on Hope, then make a right turn going back on 82nd Street towards the gas station. Ruzinski followed the Kia southbound on 82nd. (Id. at 59-61.) The Kia was again proceeding very slowly, and the driver was scanning right and left looking at people on the sidewalk. As the Kia approached the Citgo, the driver looked into the gas station, stopped at the stop sign, then slowly turned right and proceeded in the parking lane on Capitol at about 10 mph in a 35 mph zone. (Id. at 61.) The driver was again looking over to the gas station. The driver signaled a right turn onto 83rd Street, as if to make another loop around to scan for someone in the area. At that point, Ruzinski believed that the driver was their subject and directed their takedown car, operated by uniformed Officer Staci Steen, to conduct a traffic stop. (Id. at 62.) Steen and Ruzinski pulled over the Kia (id. at 70), which was being driven by defendant (id. at 65). McKee arrived shortly thereafter. (Id. at 70.)

Ruzinski testified that defendant got out of the Kia, asked what was going on, and Ruzinski was able to recognize defendant's voice from "Bill's" recorded phone conversation with Lips. McKee apparently also recognized the voice, and he nodded to Ruzinski, which Ruzinski interpreted to mean, that's the subject. Defendant was arrested, patted down and placed in a squad to await Detective Lips, who arrived about thirty minutes later. (Id. at 66, 70, 72, 74.)

**C.   Detective McKee**

McKee testified that he was assigned to the High Technology Unit and had been a detective for ten years. (Nov. 6, 2006 Hrg' Tr. at 93.) He stated that on August 23, he was in

5

his office awaiting information from Lips on a pending operation regarding a traveler from Texas. He stated that he had previously discussed the matter with Lips and listened to Lips's recorded phone call with the subject. (id. at 94.)

McKee testified that at about 12:09 p.m., Lips advised him that the subject was in Milwaukee at the intended meeting spot, which caught the officers off-guard. He and Ruzinski got into undercover vehicles and proceeded to the area of the meeting spot, which took about fifteen or twenty minutes. (Id. at 95-96.) McKee testified that when he arrived he circled the area then set up on 82nd Street facing southbound just north of the alley running behind the Citgo and waited. (Id. at 97-98.) Detective Lips then informed McKee that the subject was back on line, and Ruzinski advised that he had gone mobile looking for the subject. (Id. at 98-99.) Ruzinski advised McKee that he saw the subject parked on the 3800 block of 82nd Street typing on a laptop. Ruzinski stated that he could not get the license plate and asked that McKee drive by to get it. McKee drove south and saw the Kia with the subject standing outside of it, placing a laptop computer in the backseat. McKee got the plate number and relayed the information. (Id. at 99-101.) The plate listed to a Buick owned by a rental agency at O'Hare. (Id. at 101.) McKee returned to his original location and waited for the subject to come to the meet spot. He then observed the Kia approaching his position on 82nd Street, cross Capitol, with the driver looking into the Citgo lot as he drove by very slowly. (id. at 101-02.)

The Kia proceeded past McKee outside his view, and Ruzinski informed McKee that the driver was headed back southbound on 82nd Street towards the gas station. The Kia again passed McKee at about 10 mph, the driver looked into the Citgo lot, then turned westbound on Capitol in the curb lane driving very slowly, again scanning the Citgo parking lot. (Id. at 103.) The Kia turned north on 83rd Street, and McKee pulled forward in case the subject tried to cut

6

through the alley. Ruzinski then called for the Kia to be stopped, and McKee proceeded to the location of the stop. (Id. at 104.) Officer Steen directed defendant to exit the vehicle, defendant asked what was going on, and McKee recognized defendant's as the voice on the tape Lips had previously played for him. (Id. at 105-06.) McKee then told defendant to put his hands behind his back, and Steen handcuffed him. (Id. at 134.)

**D.    Officer Steen**

Officer Steen testified that she was contacted by Detective Lips to assist in a takedown of a subject he was investigating. (Id. at 145.) She was told to go to the area of 82nd and Capitol and stand by for further instructions. (Id. at 145.) She indicated that she was involved because she was a uniformed officer operating a squad car. (Id. at 146.)

Steen testified that she observed defendant traveling north on 83rd Street when Lt. Ruzinski gave the order to stop defendant's vehicle. (Id. at 147.) She drove around Ruzinski, who was tailing defendant, activated her squad lights and pulled defendant over. (Id. at 147.) Steen testified that she exited the squad and told defendant to show his hands, step out of the vehicle, turn around and face the vehicle. Defendant complied. McKee and Ruzinski arrived to assist, and Steen handcuffed defendant. (Id. at 148.) She stated that she put the cuffs on defendant immediately, and that she believed defendant made no statements to her. (Id. at 149.)

## II.  DISCUSSION

**A.    Applicable Legal Standard**

A police officer may legally stop and arrest a suspect without a warrant if he has probable cause to believe that the suspect committed a crime. United States v. Sawyer, 224

7

F.3d 675, 678 (7th Cir. 2000). An officer has probable cause to make an arrest when the facts and circumstances within his knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense. Id.

> Probable cause requires only a substantial chance of criminal activity, not an actual showing of such activity. Although mere suspicion is not enough, probable cause need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false. The determination of whether probable cause exists in a given situation involves examining the totality of the circumstances in a common sense manner.

United States v. Schaafsma, 318 F.3d 718, 722 (7th Cir. 2003) (internal citations and quote marks omitted).

**B.     Analysis**

The officers had probable cause to stop and arrest defendant in the present case. Lips arranged to meet "Bill" at the Citgo gas station located at 82nd and Capitol. Ruzinski and McKee responded to the area to set up surveillance, and Ruzinski observed a man parked in the area typing on a lap-top computer at the same time Bill was messaging Lips. McKee then saw the man get out of his car and place a lap-top in the back seat at the same time Bill went off-line with Lips. The officers ran the plate on the car, which listed to a rental agency at O'Hare. This was consistent with the information the officers had about the subject – that he would be flying into Milwaukee that morning. Although the car listed to an agency at O'Hare, the officers testified that it was not uncommon for agencies in Milwaukee and Chicago to share cars.

Immediately after Lips disclosed that "Nick" lived north of Capitol on 82nd Street and would be proceeding to the gas station, the officers saw defendant, who was facing

8

southbound, make a u-turn and drive very slowly north on 82nd as if he were looking for someone. Defendant then turned around and drove very slowly back towards the gas station, scanning right and left looking at people on the sidewalk. When he reached the Citgo, defendant looked into the gas station, then turned right into the parking lane on Capitol, while continuing to scan the gas station. Defendant then turned right onto 83rd Street, as if to make another loop around the area, at which point Ruzinski directed the takedown.

Based on the totality of these circumstances – defendant's typing on the computer at the same time "Bill" was messaging Nick, defendant's placement of the computer in the backseat at the same time "Bill" logged off, defendant's driving slowly north on 82nd Street across Capitol immediately after Lips told him that "Nick" lived on 82nd north of Capitol and was on his way, and defendant's slow canvassing of the area around the Citgo where he expected to meet "Nick" – the officers had probable cause to stop defendant. It is true that "Bill" represented himself to be twenty-nine years old, 6'1" and 185 pounds, while defendant is significantly older and heavier. However, as the highly experienced officers testified, it is not uncommon for people to misrepresent themselves over the internet. Thus, they were not necessarily looking for someone matching a likely bogus physical description. As Ruzinski testified, based on his experience in these cases, "The targets often lie. What we're looking for is their actions when they come to the scene, more so than their physical appearance." (Tr. at 84.) Based on their observations of defendant, the officers had probable cause for an arrest.

In his objections, defendant argues, based on a re-creation staged by two investigators, that it was not possible for Ruzinski to see him typing on a computer as he drove by.[1] In its

---

[1] Defendant asks that I hold a de novo hearing to explore the matter further.

9

response, the government points to flaws in the re-creation. I need not definitively resolve the issue because, even if I were to disregard Ruzinski's testimony that he saw defendant's fingers on the keyboard, defendant offers no explanation for the fact that Ruzinski contemporaneously advised McKee that the subject was typing on a laptop, which supports the notion that Ruzinski believed he saw defendant typing.[2] Further, defendant has no answer for McKee's testimony that immediately after "Bill" went off-line with Lips, McKee saw defendant exit the Kia and place a lap-top computer in the back seat.[3] Finally, the officers did not arrest defendant based on his alleged typing alone. Rather, they followed him as he canvassed the area, slowly driving around looking for "Nick," thereby corroborating their belief that defendant was the subject they were after. Defendant posits innocent explanations for his driving pattern, but police officers need not rule out all innocent explanations before acting. See, e.g., Panetta v. Crowley, 460 F.3d 388, 395-96 (2d Cir. 2006) (stating that the existence of an innocent explanation does not negate probable cause); United States v. Martin, 289 F.3d 392, 400 (6th Cir. 2002) ("Although innocent explanations for some or all of these facts may exist, this possibility does not render the officers' determination of probable cause invalid."); see also Kelley v. Myler, 149 F.3d 641, 646 (7th Cir. 1998) (holding that once an officer has established probable cause, he need not continue investigating in order to rule out claims of innocence). This is particularly true given Ruzinski and McKee's vast experience in this particular type of investigation. United States v.

---

[2] Even in defendant's re-creation photos, it is possible to see the occupant of the Kia leaning over the passenger seat as if he were typing on a laptop.

[3] Defendant disputes that McKee could have seen the computer because his body would have blocked McKee's view. Defense counsel cross-examined McKee on this point extensively, but McKee remained steadfast in his observation. (Tr. at 119-22.) There is no evidence that McKee could not physically have made the observation, and I see no reason to disbelieve his testimony in this regard.

10

Parra, 402 F.3d 752, 765 (7th Cr. 2005) (noting that the court can rely on the specialized experience of the officers involved). Therefore, even if Ruzinski could not have physically seen all that he claimed, probable cause existed for the stop.[4]

After the stop, Steen ordered defendant to show his hands and exit his car. According to Ruzinski and McKee, defendant asked what was going on, and they recognized his voice from the taped phone conversation between "Bill" and "Nick." McKee then directed that defendant be cuffed and arrested. The officers' voice recognition provided a further basis for identifying defendant as their subject and ordering his arrest. Once defendant was arrested, the officers were permitted to search his car incident thereto. See New York v. Belton, 453 U.S. 454, 460 (1981).

Defendant points to Steen's testimony that defendant made no statements after he exited the car, and that she arrested him immediately. However, defendant overstates the significance of Steen's brief testimony. The relevant exchange with defense counsel was as follows:

> Q. Immediately ask him to step out of the vehicle?
>
> A. As I approach I'm saying let me see your hands. When I cannot see somebody's hands during a traffic stop and I'm able to audibly tell them I'd like to see your hands I usually do so.
>
> And then as, when I got to the door then I asked him to exit the vehicle.
>
> Q. And then you put the cuffs on him immediately?
>
> A. Correct.

---

[4]Defendant claims that this potential discrepancy casts doubt on all of Ruzinski's testimony. However, based on the fact that Lips, Ruzinski and McKee corroborated one another on all materials points, I see no basis for such an assertion.

11

> Q. And there's no protest from Mr. Doyle?
>
> A. No.
>
> Q. Any statements at all?
>
> A. Not to me, I don't believe so.

(Tr. at 149.)

Steen did not definitively state that defendant made no statement; rather, she stated that she did not believe he made any statement to her. Ruzinski testified that defendant directed his statement to McKee. (Tr. at 66.) Thus, the testimony is not directly contradictory. In any event, to the extent that Steen's testimony could be interpreted as a denial of any statement by defendant, given their greater involvement and familiarity with the case, I find it more likely that, as Ruzinski and McKee consistently and clearly testified, defendant did ask them what was going on as he exited the squad. Steen's involvement was limited to acting as the uniformed takedown officer; she knew little or nothing more about the investigation. (See id. at 145.) Thus, she had no reason to focus on defendant's voice, as did McKee and Ruzinski, who wanted to hear if defendant's voice matched that on the tape Lips made. Further, Steen's testimony that she immediately cuffed defendant after he exited the squad is not really inconsistent with Ruzinski and McKee's testimony; the latter officers both stated that defendant exited the Kia, asked what was going on, they recognized his voice, and directed that he be cuffed. By all accounts, defendant was cuffed momentarily after he exited his car.

Defendant argues that it was not possible for McKee and Ruzinski to identify his voice based on their brief encounter outside the car. However, both officers testified that they clearly recognized defendant's voice, and defendant offers no good reason to disregard their testimony. In any event, probable cause is, as the phrase implies, concerned with probabilities,

12

not certainties. The officers' encounter with defendant was sufficient for them to reasonably and plausibly identify him as "Bill" from the tape.

Finally, even if I were to disregard the testimony as to defendant's statement and the officers' voice recognition, I would find that the officers had probable cause to arrest defendant based on his behavior prior to the stop. Based on the factors discussed above, the officers developed sufficient information to believe that defendant was probably their target and had traveled from Texas in order to have sex with a fifteen year old boy.

Therefore, for these reasons and those stated by the magistrate judge, I find that the officers had probable cause to stop and arrest defendant, and his motion to suppress must accordingly be denied.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 49) is **ADOPTED**, and defendant's motion to suppress (R. 23) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 23rd day of February, 2007.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

13

Case 2:06-cr-00224-LA   Filed 02/23/07   Page 13 of 13   Document 64