# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                                     **Case No. 06-CR-224**

**WILLIAM DOYLE**
    **Defendant.**

## DECISION AND ORDER

The government charged defendant William Doyle with traveling in interstate commerce for the purpose of engaging in illicit sexual conduct with a minor, 18 U.S.C. § 2423(b), use of a computer to attempt to entice a minor to engage in sexual activity, 18 U.S.C. § 2422(b), and distribution and possession of child pornography, 18 U.S.C. §§ 2252(a)(2) & (a)(4)(B). The charges arose out of an internet sting in which City of Milwaukee Police Department ("MPD") Detective Sean Lips, posing as a fifteen-year-old boy, arranged to meet defendant, a resident of Texas, at a gas station on the City's northwest side. Officers arrested defendant when he arrived at the rendezvous site.

Defendant moved to suppress one of his statements to law enforcement, arguing that the officers obtained the statement by delaying his initial appearance beyond the six-hour "safe harbor" period set forth in 18 U.S.C. § 3501(c). The motion was referred to a magistrate judge, who declined to hold a hearing and recommended that the motion be denied. Defendant objected, requesting de novo review and an evidentiary hearing. See Fed. R. Crim. P. 59(b)(3). I held a hearing and received post-hearing briefs. The matter is now ready for decision.

## I. FACTS

On August 23, 2006, at about 1:06 p.m., Detective Richard McKee and Lt. Dan Ruzinski of the MPD's Criminal Investigation Bureau, High Technology Unit, arrested defendant for use of a computer to facilitate a child sex crime, contrary to state law. (May 30, 2007 Hr'g Tr. at 4-5; 14; 53.) After a brief interview at the scene, at about 2:30 p.m. officers conveyed defendant to the MPD building downtown, where he was booked and processed. (Id. at 6; 12; 14; 53.)

At about 3:00 p.m. that afternoon, McKee contacted the U.S. Attorney's Office to determine whether the government would be interested in pursuing federal charges in the case. (Id. at 13; 16; 53.) Advised that the government might be interested, McKee began working on a draft affidavit for a federal complaint, which he e-mailed to the U.S. Attorney's Office late that night or early the next morning. (Id. at 16-18; 25-26; 35; 56; see also id. at 55.) At the time, McKee hoped that the case would be handled federally (id. at 19), but the final decision to pursue the case in federal court was not made until the next morning (id. at 21). McKee made no contact with any state prosecutor and drafted no state affidavits at any time after defendant's arrest on August 23. (Id. at 22; 32.) However, Lips did complete a state arrest-detention report, which is provided to a state court judge for a probable cause determination.[1] (Id. at 68-73; Govt. Ex. 13.)

Lips interrogated defendant at the MPD building on August 23 from 7:28 p.m. until 11:43 p.m. (Id. at 47.) The interview concluded when both men became tired, but defendant asked to continue it on the following day. (Id. at 51; see also id. at 39; 47.)[2]

---

[1] Lips never had to present the document to a state judge because the federal case commenced within forty-eight hours of defendant's arrest. (Id. at 68-73; Govt. Ex. 13.)

[2] Defendant does not seek suppression of this statement.

2

Some time between 8:00 a.m. and 11:00 a.m. on August 24, McKee spoke to the assigned AUSA, who indicated that the case would be pursued federally. (Id. at 23-24; 29.) Around 11:00 a.m., McKee and Lips proceeded to the AUSA's office and met with her. At about 11:30 a.m., they all proceeded to the chambers of Magistrate Judge Aaron E. Goodstein, and at about 11:50 a.m. Judge Goodstein issued an arrest warrant and criminal complaint based on Lips's affidavit charging defendant with a violation of 18 U.S.C. § 2423(b). (Id. at 8-9; 28; 30.) However, defendant's initial appearance on the federal complaint could not be held until the following morning due to the unavailability of a magistrate judge. Therefore, defendant remained in MPD custody. (Id. at 9; 30.)

McKee and Lips interrogated defendant again at the MPD building on August 24 between 4:01 p.m. and 7:52 p.m. (Id. at 10-11; 33.) Neither officer advised defendant of the newly acquired federal warrant (id. at 33; 52; 63), but Lips did provide Miranda rights, which defendant waived (id. at 10; 33; 48). The officers planned to conduct the interview earlier that day, but had to delay it because defendant was taken to the hospital for medical treatment. (Id. at 8; 47.)[3]

On August 25 at about 8:30 a.m., the MPD released defendant and transferred him to the custody of the U.S. Marshal. (Id. at 6.) McKee testified that in order to secure defendant's release that morning, he had to present a copy of the federal arrest warrant and obtain permission from a supervisor in the prisoner processing section. (Id. at 6-7; 37.) McKee stated that defendant was not released on the state charge upon which he was originally arrested until 8:30 that morning, but admitted that the federal warrant he received the previous day required

---

[3]This is the statement defendant seeks to have suppressed.

him to maintain custody of defendant.[4] (Id. at 36.) At about 10:00 a.m. on August 25, defendant appeared before Magistrate Judge Goodstein, who ordered him detained. (R. 2.) The government obtained an indictment on September 19. (R. 9.) No state charges were ever filed.

## II. DISCUSSION

### A. Safe-Harbor Standard

Fed. R. Crim. P. 5(a) requires an officer making an arrest to "take the defendant without unnecessary delay before a magistrate judge." The magistrate judge must then advise the defendant of certain rights, including his right to counsel and his right not to make a statement. Fed. R. Crim. P. 5(d)(1).

In McNabb v. United States, 318 U.S. 332 (1943) and Mallory v. United States, 354 U.S. 449 (1957), the Supreme Court held that violation of the Rule 5(a) prompt presentment requirement would result in suppression of any custodial statement the defendant made during the period of delay. Congress later enacted 18 U.S.C. § 3501(c), which establishes a six-hour "safe harbor" for statements made prior to presentment before a magistrate judge. Section 3501(c) provides, in pertinent part:

> In any criminal prosecution by the United States . . ., a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention[.]

---

[4]McKee testified that defendant was not transferred to the U.S. Marshal Service on the afternoon of August 24 because the Marshal does not hold people overnight, and they wanted to continue interviewing defendant. (Id. at 36; 40.)

4

In the present case, defendant contends that his August 24, 2006 statement should be suppressed because it was made outside of the six-hour safe harbor period. The critical issue for purposes of the motion is when the six-hour period began.

The Seventh Circuit has held that the "six-hour clock begins to run for purposes of section 3501(c) when the individual is arrested or otherwise detained for a violation of federal law, not when he is taken into federal custody." United States v. Mansoori, 304 F.3d 635, 661 (7th Cir. 2002) (citing United States v. Alvarez-Sanchez, 511 U.S. 350, 358 (1994)). In Mansoori, for instance, the defendant (Cox) was arrested by Chicago police officers on a federal warrant, held locally and turned over to federal authorities about two days later. The court held that:

> Although it was the Chicago police who arrested Cox, they did so pursuant to a federal arrest warrant. Consequently, the statutory clock began to run on Saturday evening, when Cox was arrested, not on Monday morning, when he was transferred to federal custody. As the clock had been running for approximately thirty-six hours by the time Cox confessed . . . , his confession is not protected by the statutory safe harbor.

Id.

In Alvarez-Sanchez, the Supreme Court, in discussing when the duty to present arises, further explained that:

> there can be no "delay" in bringing a person before a federal magistrate until, at a minimum, there is some obligation to bring the person before such a judicial officer in the first place. Plainly, a duty to present a person to a federal magistrate does not arise until the person has been arrested for a federal offense. Until a person is arrested or detained for a federal crime, there is no duty, obligation, or reason to bring him before a judicial officer "empowered to commit persons charged with offenses against the laws of the United States," and therefore, no "delay" under § 3501(c) can occur.
>
> In short, it is evident . . . that the "arrest or other detention" of which the subsection speaks must be an "arrest or other detention" for a violation of federal law. If a person is arrested and held on a federal charge by "any" law

5

> enforcement officer – federal, state, or local – that person is under "arrest or other detention" for purposes of § 3501(c) and its 6-hour safe harbor period. If, instead, the person is arrested and held on state charges, § 3501(c) does not apply, and the safe harbor is not implicated. This is true even if the arresting officers (who, when the arrest is for a violation of state law, almost certainly will be agents of the State or one of its subdivisions) believe or have cause to believe that the person also may have violated federal law. Such a belief, which may not be uncommon given that many activities are criminalized under both state and federal law, does not alter the underlying basis for the arrest and subsequent custody. As long as a person is arrested and held only on state charges by state or local authorities, the provisions of § 3501(c) are not triggered.

511 U.S. at 358 (footnote and citations omitted).

**B.   Analysis**

    **1.   Applicability of the Safe-Harbor**

This case presents an interesting and as far as I can tell, novel, question as to when the safe-harbor period begins to run in the case of a defendant, held by state authorities on state charges, becomes the subject of a federal arrest warrant and complaint obtained by the same state officers. As discussed above, on August 23, 2006, at 1:06 p.m., MPD officers arrested defendant on state charges. Later that afternoon, McKee contacted the U.S. Attorney's Office about a federal prosecution and began working on a federal complaint. That night, from 7:28 p.m. to 11:43 p.m., Lips interrogated defendant. Some time the following morning, McKee learned that the government would pursue the case, and at about 11:50 a.m. a magistrate judge issued a federal complaint. However, defendant's initial appearance could not be scheduled until the next day, and the federal warrant was not immediately executed. Later that day, from 4:01 p.m. to 7:52 p.m., Lips and McKee interrogated defendant again. Finally, on August 25, 2006, at 8:30 a.m., the MPD released defendant and transferred him to federal custody for an initial appearance on the federal complaint.

6

Defendant argues that he was held principally on federal charges as of the morning of August 24, when McKee was advised that the government would prosecute the case. At the very latest, he contends that the six-hour clock began with the issuance of the federal warrant and complaint at 11:50 a.m. Defendant notes that the officers could not have released him after that, even if state charges had been declined. In any event, the officers never consulted any state prosecutor. Thus, defendant claims that it was clear as of the morning of August 24 that the case would proceed federally, and that he was not thereafter held solely for state charges. Accordingly, he contends that the six-hour period expired before or during the August 24 interview. Defendant notes that the government has not established that any particular statements during this interview were made before the safe harbor period expired, even if the period did not begin until the federal warrant issued.[5]

The government contends that because defendant was held on state charges at the time he gave the August 24 statement, the safe harbor is not implicated at all. The government acknowledges that a federal warrant was issued earlier on August 24, but argues that the mere existence of an un-executed warrant and complaint cannot lead to the conclusion that defendant was under federal arrest or detention under § 3501(c), triggering a duty to present him to a federal magistrate. The government contends that defendant remained in state custody until he was formally released by the MPD on the state charges and taken into the Marshal's custody upon execution of the federal arrest warrant on August 25, 2006, at 8:30

---

[5]The warrant issued at 11:50 a.m., and the statement was taken from 4:01 p.m. to 7:52 p.m. Thus, assuming that the warrant started the clock, the statement commenced within the safe harbor but concluded outside it. Lips and McKee testified that they had no way of telling when defendant said what during this interview. (Id. at 33-34; 64.)

7

a.m.[6]  Only then did the six-hour period begin to run.

The government's position has the benefit of clarity and appears most consistent with Alvarez-Sanchez. Alvarez-Sanchez teaches that the existence of probable cause to arrest and hold a defendant for both state and federal charges does not start the six-hour clock, so long as the defendant is actually held on state charges.[7]  511 U.S. at 358.  Nor does the state's later failure to arraign or prosecute the defendant on such state charges alter this conclusion.  Id. at 359.  "Although Congress could have provided that the exercise of prosecutorial discretion by the State in this scenario retroactively transforms time spent in the custody of state or local officers into time spent under 'arrest or other detention' for purposes of § 3501(c), it did not do so in the statute as written."  Id.  The government's position also comports with common practice.  Federal courts often issue indictments or complaints against defendants held in state custody.  Ordinarily, this results in the filing of a detainer with the state authorities, which may trigger certain rights under the Interstate Agreement on Detainers, 18 U.S.C. App. § 2, but not an immediate duty to present the defendant to a federal magistrate.

Alvarez-Sanchez appears to represent an attempt by the Court to develop clear rules to guide officers required to promptly present defendants under Rule 5(a).  Consistent with Alvarez-Sanchez and Mansoori, the duty to present arises when the defendant is arrested on federal charges (by any law enforcement agency), transferred to federal custody on execution

---

[6]The warrant itself indicates that it was executed on August 25, 2006.  (Case No. 06-mj-00100, Docket # 9.)

[7]Defendant argues that Alvarez-Sanchez is distinguishable because, in this case, the officers did not simply realize that he had also violated federal law, but one where the arresting officers actively sought and obtained a federal complaint.  However, I read the Court to be saying that it is the fact of formal arrest on state charges that matters, rather than the existence of probable cause for a federal offense, whether judicially sanctioned or not.

8

of a warrant or activation of a detainer, or formally detained on federal charges. Neither occurred in the present case until August 25. Rather, he was subject to one seamless custody following his arrest on state charges until the morning he appeared in federal court.

The wrinkle in this case is that the same officers who arrested and held defendant on state charges (and took the statement at issue) also pursued and obtained the federal complaint.[8] An un-executed warrant does not trigger a duty to present the defendant if the defendant is held by authorities other than those who have the warrant. Here, however, the officers who obtained the warrant were the same officers who held the defendant. Presumably, they could have executed the warrant and presented defendant before a magistrate at any time convenient to the magistrate. This scenario presents a danger that the detaining officials will intentionally delay executing the warrant in order to avoid the prompt presentment requirement.

> In Alvarez-Sanchez, the Court recognized this possibility,
>
>> namely, the situation that would arise if state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow [interrogation] in violation of his right to a prompt federal presentment. Long before the enactment of § 3501, we held that a confession obtained during such a period of detention must be suppressed if the defendant could demonstrate the existence of improper collaboration between federal and state or local officers. In this case, however, [the] District Court concluded that there was "no evidence" that a "collusive arrangement between state and federal agents . . . caused [respondent's] confession to be made," and we see no reason to disturb that factual finding. It is true that the Sheriff's Department informed the Secret Service agents that counterfeit currency had been found in respondent's possession, but such routine cooperation between local and federal authorities is, by itself, wholly unobjectionable: "Only by such an interchange of information can society be adequately protected against crime."
>
> 511 U.S. at 359-60 (internal citations omitted).

---

[8]In Alvarez-Sanchez, conversely, the federal agents who took the statement at issue were not associated with the state officers who arrested and detained the defendant.

9

In the present case, I see no evidence that McKee and Lips declined to execute the warrant in an attempt to delay defendant's presentation before a magistrate judge. I likewise see no evidence of collusion between the MPD and U.S. Attorney's Office to allow an additional interview. The August 24 interview continued at defendant's request, and there is no indication that the officers would have failed or refused to present defendant on that date had a magistrate been available.[9] Therefore, I find no attempt to circumvent the prompt presentment requirement, which would require suppression notwithstanding the safe-harbor.

## 2. Exclusion

However, even if the six-hour clock ran out prior to or during the August 24 interview, I would still deny the motion. As the Seventh Circuit has noted, in such a situation, "[e]xclusion is not automatic but discretionary, turning on 'a congeries of factors, including such elements as the deterrent purpose of the exclusionary rule, the importance of judicial integrity, and the likelihood that admission of evidence would encourage violations of the Fourth Amendment.'" Mansoori, 304 F.3d at 660-61 (quoting United States v. Gaines, 555 F.2d 618, 623-24 (7th Cir. 1977)).

Under the circumstances of this case, the purposes of the exclusionary rule would not be served by granting suppression. As the Supreme Court explained in Arizona v. Evans:

---

[9]Defendant points out that in Mansoori, the court rejected an argument that the defendant's statement should not be suppressed because his initial appearance was delayed due to the court's calendar. 304 F.3d at 662 ("But once instructed by the district court to present Cox that afternoon, and in the absence of any apparent exigency necessitating an immediate interview, the advisable course would have been to put the interview on hold until Cox had been arraigned."). The court made this observation in the context of deciding whether suppression was warranted under § 3501(c), not when the six-hour period began to run. In the present case, the fact that defendant's initial appearance was delayed due to the court's calendar, rather than some design by the officers, demonstrates that there was no improper collusion between state and federal authorities.

10

> The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct. The exclusionary rule operates as a judicially created remedy designed to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect. As with any remedial device, the rule's application has been restricted to those instances where its remedial objectives are thought most efficaciously served. Where the exclusionary rule does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted.

514 U.S. 1, 10-11 (1995) (internal citations and quote marks omitted).

First, as evidenced by the foregoing discussion of the applicability of the statutory "safe-harbor," the issue of whether the officers violated defendant's rights under Rule 5(a) is highly debatable. It was not unreasonable under the circumstances for the officers to believe that defendant remained in state custody until the morning of August 25, and that they had no duty to present him to a federal magistrate based on the un-executed federal warrant. Further, the officers were able and willing to produce him sooner but were told that no magistrate was available until the next day, and that the U.S. Marshal would not accept him until the initial appearance was set.

Second, the officers commenced the interview within six hours of the issuance of the federal warrant. Further, the evidence shows that defendant requested a continuation of the August 23 interview to August 24, to which the officers agreed. Finally, the officers wanted to commence the interview earlier on August 24 but had to delay it based on defendant's conveyance to the hospital for medical treatment. Thus, there is no evidence of any design on the part of the officers to delay the interview on August 24.

Given all of these factors, I find that suppressing the statement – which was wholly voluntary and consistent with Miranda – would not serve the purposes of the exclusionary rule.

11

Therefore, the motion must be denied for this reason as well.[10]

---

[10] In the course of litigating this motion, defendant sought certain information pertaining to the timing of the decision to prosecute the case federally. The government resisted such disclosure, arguing that the communications between the U.S. Attorney's Office and law enforcement were protected by the attorney client and attorney work product privileges. See, e.g., United States v. Zingsheim, 384 F.3d 867, 871 (7th Cir. 2004) (noting that the "attorney-client privilege covers conversations between the prosecutors (as attorneys) and client agencies within the government[,] work-product privilege applies to many other discussions between prosecutors and investigating agents, both state and federal[, and the] deliberative-process privilege covers memoranda and discussions within the Executive Branch leading up to the formulation of an official position"). I have attempted to be sensitive to the government's concerns. It is generally not the business of the court how a prosecutorial decision was made. Thus, I initially suggested that the parties attempt to reach a stipulation on the facts in lieu of holding a hearing. When that proved impossible, I agreed to conduct a hearing, at which I allowed the defense some leeway in exploring the timing of the decisions in this case. However, I declined to order the government to produce the contents of any e-mail communications with the officers in this case, including any draft affidavits. I did, however, request that the AUSA discuss with her superiors disclosing the timing of the e-mail communications with McKee in this case, as McKee could not recall when he first sent the draft affidavit. (May 30, 2007 Hr'g Tr. at 74-78.) The government resists even this limited disclosure. The time an e-mail was received reveals nothing of the inner workings of the U.S. Attorney's Office or of the nature of any cooperation between the government and local law enforcement. Further, it is well-settled that the attorney-client privilege protects only the contents of communications between counsel and client, not the date those communications occurred. See, e.g., Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 467 (2d Cir. 1989) ("Though the statements made to the attorney for the purpose of seeking legal advice and the advice given by the attorney are normally protected by the privilege, the fact and date of the consultation would not be privileged."); Savoy v. Richard A. Carrier Trucking, 178 F.R.D. 346, 350 (D. Mass. 1998) (stating that "the fact of the attorney-client relationship and the dates on which services were performed are not necessarily privileged"); Condon v. Petacque, 90 F.R.D. 53, 54 (N.D. Ill. 1981) ("The privilege does not foreclose inquiry into the fact of representation itself or the dates upon which services are rendered as long as the substance of the attorney-client relationship is shielded from disclosure."). Likewise, the date and time of a communication from client to counsel reveals nothing of the lawyer's mental impressions, which is the subject of the work product privilege. See, e.g., United States v. Nobles, 422 U.S. 225, 238 (1975) ("At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."); McCrink v. Peoples Benefit Life Ins. Co., 60 Fed. R. Serv. 3d (Callaghan) 86 (E.D. Pa. 2004) (stating that the attorney client and work-product privileges do not extend to the fact of consultation or the dates of legal services performed); see also Allendale Mut. Ins. Co. v. Bull Data Sys., Inc., 152 F.R.D. 132, 135 (N.D. Ill. 1993) ("As the attorney-client and work product privileges obscure the search for truth, they are both narrowly construed by courts to restrict their impact upon the discovery process."). Thus, the government's objection to revealing the time the e-mail from McKee was

12

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion to suppress (R. 22) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 14th day of August, 2007.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

received is not well-taken. Nevertheless, I find it unnecessary to pursue the issue further, as the motion can be resolved based on the facts of record.